# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40484**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Justin COUTY**
Air Force Cadet (AFC), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 February 2025

————————————

*Military Judge*: Dayle P. Percle.

*Sentence*: Sentence adjudged 21 January 2023 by GCM convened at the United States Air Force Academy, Colorado. Sentence entered by military judge on 28 March 2023: Dismissal, confinement for 60 months, forfeiture of all pay and allowances, and a reprimand.

*For Appellant*: Major Trevor N. Ward, USAF.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Major Brittany M. Speirs, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

WARREN, Judge:

A general court-martial composed of a military judge found Appellant guilty, contrary to his pleas, of two violations of Article 120, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. § 920, for sexually assaulting SM and AR.[1,2] The military judge sentenced Appellant to a dismissal, confinement for 60 months, forfeiture of all pay and allowances, and a reprimand. The convening authority took no action on the findings or the sentence.

Appellant raises four issues on appeal, which we reworded as follows: (1) whether Appellant's conviction for sexual assault of SM is legally and factually insufficient; (2) whether Appellant's conviction for sexual assault of AR is legally and factually insufficient; (3) whether Article 25, UCMJ, 10 U.S.C. § 825, is unconstitutional as applied to Appellant because Appellant was denied a "jury of his peers" where United States Air Force Academy (USAFA) cadets were not permitted to serve as court-martial panel members at Appellant's court-martial;[3] and (4) whether this court deprived Appellant of his constitutional and statutory right to counsel by denying Appellant's twelfth requested enlargement of time (EOT) to file an initial brief in this case.[4] We also considered an additional issue, not raised by Appellant, which was identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (5) whether Appellant is entitled to relief for facially unreasonable appellate delay pursuant to *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002).

As to issue (3), we hold Appellant affirmatively waived his right to challenge the constitutionality of a "jury of his peers" when, at trial, before a military judge, and after he was fully informed of his forum election rights, Appellant knowingly and voluntarily elected to be tried by military judge alone. *See* Article 16(b)(3), UCMJ, 10 U.S.C. § 816(b)(3); Rule for Courts-Martial (R.C.M.) 903(c)(2); *see also United States v. St. Blanc*, 70 M.J. 424, 427–28 (C.A.A.F. 2012) (holding that a proper R.C.M. 903 rights advisement and election of trial of military judge alone forum constitutes a waiver to the right to trial by court-members). Generally speaking, "a valid waiver leaves no error to correct on appeal." *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (citation

---

[1] Unless otherwise indicated, all references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The military judge found Appellant not guilty of one other specification of sexual assault against a third alleged victim, and not guilty of two specifications of abusive sexual contact against a fourth alleged victim, all in violation of Article 120, UCMJ.

[3] Appellant personally raises this issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] On 6 December 2024, the court granted Appellant leave to file issue (4) as a supplemental assignment of error.

omitted). Here, we decline to pierce Appellant's knowing and voluntary waiver.[5]

As to the remaining assignments of error, we have carefully considered each and find no error that materially prejudiced his substantial rights. Accordingly, we affirm the findings and sentence.

## I. BACKGROUND

A military judge sitting as a court-martial convicted Appellant of sexual assault in violation of Article 120, UCMJ, against two different fellow USAFA cadets: SM on or about 26 November 2019, and AR on or about 6 March 2021.

---

[5] While we arguably retain waiver-piercing authority on this issue insofar as one of the charged and convicted specifications in this case predates the 2021 amendments to Article 66, UCMJ, 10 U.S.C. § 866, which removed that authority, we decline to exercise that power in this case. *See* National Defense Authorization Act for Fiscal Year 2021 (FY21 NDAA), Pub. L. No. 116-283, § 542(b)(1), 134 Stat. 3388, 3611–12 (1 Jan. 2021) (removing the words "should be approved" from our factual sufficiency review authority). Our superior court has explained that under the version of Article 66, UCMJ, applicable to Appellant's case, we have an obligation to review the entire record and have the authority to "leave [appellant's] waiver intact or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted). Having carefully reviewed the record in Appellant's case, we stand by our repeated admonition that "we will only ignore waiver in the most deserving cases." *United States v. Blanks*, No. ACM 38891, 2017 CCA LEXIS 186, at *22 n.11 (A.F. Ct. Crim. App. 17 Mar. 2017) (unpub. op.), *aff'd*, 77 M.J. 239 (C.A.A.F. 2018).

Finally, even if we were inclined to pierce waiver, we decline the premise of Appellant's assignment of error, namely that he has a Fifth and Sixth Amendment right to a "jury of his peers." U.S. CONST. amend. V, VI. He does not. As our superior court recently and explicitly reaffirmed in *United States v. Anderson*, "the Sixth Amendment right to a jury trial has never applied in the military justice system." 83 M.J. 291, 296 (C.A.A.F. 2023). Accordingly, courts-martial panels are not required to represent the community or be a jury of peers because they are "not subject to the jury trial requirements of the Sixth Amendment, and, therefore, military members are not afforded a trial in front of a representative cross section of the military community." *United States v. Riesbeck*, 77 M.J. 154, 162 (C.A.A.F. 2018) (citation omitted). Rather, over 70 years of military caselaw consistently holds that what Appellant has is a Sixth Amendment right to an impartial panel, implemented by Article 25, UCMJ, "best qualified" panel member selection criteria. *See United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (holding an accused has "the right to an impartial and unbiased panel") (citation omitted). Here, Appellant raises no challenge to the impartiality of the military judge, and having reviewed the entire record of trial, we likewise find none. In short, Appellant received all he was entitled to as a servicemember at court-martial: a fair trial by an impartial trier of fact.

The military judge acquitted Appellant of sexual assault and abusive sexual contact of two other cadets, one of whom was Appellant's then-girlfriend, II.

The primary evidence supporting the allegation that Appellant sexually assaulted SM came from SM's testimony accompanied by a handwritten apology from Appellant. The primary evidence supporting the allegation that Appellant sexually assaulted AR came from AR's testimony and from the testimony of an outcry witness to whom AR immediately reported her alleged sexual assault. In addition, the Government provided forensic evidence of a small vaginal injury found during AR's sexual assault forensic examination (SAFE) and evidence of Appellant's deoxyribonucleic acid (DNA) inside AR's underwear. More detailed discussion of the evidence follows.

## A. Sexual Assault of SM

Before the date of the charged misconduct, Appellant and SM had no prior romantic or sexual history. They were school acquaintances, but not close friends: they had studied for their USAFA nutrition class together and Appellant had helped SM prepare for her USAFA combatives class. On one occasion prior to 26 November 2019, Appellant and SM had gone out to dinner, but SM testified that she did not consider that a "date" in the romantic sense. During their association, Appellant had a girlfriend. While SM did not have a boyfriend at the time, she was not interested in dating Appellant.

On 26 November 2019, during Thanksgiving week, SM stayed at a house in Colorado Springs, Colorado, with some friends and acquaintances. They made plans to ski the next morning. Appellant asked SM to go to dinner with him in town. SM had been drinking, the house she was staying in with friends was not well stocked with food, she was hungry, and so with the understanding that they would be going as friends, she agreed. During dinner, Appellant chatted about his girlfriend while also flirting with SM. At trial, SM explained, "I didn't entirely know his intentions sometimes, because he was always flirting but even though he had a girlfriend. So, our relationship was always kind of back and forth in that sense, where the flirting was not believable because he had a girlfriend, but it was always persistent." While SM was uncertain about Appellant's motives, she had no ambiguity about her own: she was flattered in some respect by his flirting and compliments, but she never communicated any romantic or sexual interest in him in return. Specifically, SM and Appellant never discussed having sex together.

After dinner, Appellant drove SM back to the house where she was staying with friends and walked her to the door. Once there, Appellant noticed SM's friends in the house were drinking and playing beer pong. Appellant invited himself in and followed SM into the house. Once inside, SM left Appellant to play drinking games with the others and went upstairs to watch a movie with

her friend and drink wine. She neither drank with Appellant nor talked with him for the rest of the evening. Nonetheless, Appellant texted SM at 2309 that evening asking her what room she was sleeping in: "Which room is it?" SM never responded. Undeterred, Appellant found her room in the basement of the house.

Appellant arrived at SM's door uninvited, knocked and asked to come in, but before she could respond he entered anyway. This was the first time she had spoken to Appellant since returning to the house from their dinner. Appellant asked if he could spend the night because he had been drinking. As a fellow USAFA cadet concerned with keeping a classmate from drinking and driving, SM testified that she suggested he could find an air mattress in the house to crash on. However, when Appellant persisted, she agreed to let him sleep in the same twin-sized bed where she was sleeping—the only bed in the room.

Initially they positioned themselves away from each other, with SM lying next to the wall and Appellant lying on the other side of the bed along the edge, where they began to talk. Appellant told SM that he would break up with his girlfriend for SM. Initially, they were "as far apart as you can be in a twin bed" but the gap closed as Appellant stroked her arm and moved in to kiss her. When Appellant kissed SM, she reciprocated. SM said, "I remember feeling really weird and he felt weird to me and it felt wrong." To reorient from her position where she had her back pinned against the wall while she and Appellant were kissing, SM repositioned herself, briefly straddling him and kissed him a few more times. As she did this, she "felt really drunk and tired still," and decided to end the encounter, telling Appellant, "I'm too drunk for this." Appellant said, "Okay." SM further opined in her testimony, "[Appellant] seemed to take his hands off me, let me roll over on to my stomach. And he definitely knew that it was sleeping time."

After SM repositioned herself, Appellant was now against the wall and SM was lying stomach-side down on the other side of the bed along the edge with her head facing away from Appellant. SM and Appellant were not cuddling each other. Several minutes passed as SM began to drift to sleep. She did not reinitiate sexual contact with Appellant, nor communicate with him at all during this time.

Suddenly, SM felt Appellant climb on top of her back, and, without a word, pulled her underwear to the side and penetrated her vulva with his penis. During the intercourse, Appellant, a boxer on the USAFA boxing team, braced one hand on SM's back and another on the bed as he held her down in place while he penetrated her. Explaining at trial that she was essentially in a state of shock, SM did not move as Appellant penetrated her: "It's a vulnerable position and I couldn't have looked at him or he couldn't have read my facial expressions in that position. Or any body language because of the way I was basically

pinned on my stomach." In silence, Appellant continued to penetrate SM for approximately a minute while she laid still. Seeking a non-confrontational way to get him off her, SM asked Appellant to change positions. In response, Appellant moved off her, and SM rolled on her back with her legs crossed and her arms next to her sides. Appellant eventually tried reinitiating cuddling with SM, which SM rebuffed. Thereafter, Appellant did not disturb SM for the remainder of the evening. As she laid next to Appellant, SM was tired and still felt drunk. She did not leave the room or get out of bed until 0600 hours the next day. SM explained that she purposefully avoided any further physical contact with Appellant: "I stayed on that edge of the bed and then he looked like he finally went up against that wall. I think he tried to cuddle with me and then I pushed him away."

The next morning, SM woke up early and left the room without talking to Appellant. Appellant caught up to SM in the kitchen where he said goodbye and gave her an awkward hug after SM rebuffed his attempt to kiss her. After that, SM cut off contact with Appellant and stopped responding to his text messages. A few days later, SM returned from Thanksgiving break and found a handwritten apology letter from Appellant on her desk. In the letter, Appellant wrote:

> I am writing this letter because I believe in being a man and standing up for my own actions. I did not mean to put you in a situation that you were uncomfortable with.
>
> . . . .
>
> I didn't want things to end like this at all. I want to apologize for putting you through this and I hope that you continue to find happiness in your life. I know most likely that you never want to talk to me but I don't harbor any ill will towards you. Whatever comes my way I am fully willing to accept and I hope you have fun and relax over Christmas.

A handwriting expert analyzed the letter and confirmed Appellant wrote the letter. The Defense did not challenge that expert opinion at trial.

At trial, the parties each sought to characterize the significance of Appellant's letter to SM. The Government characterized it as consciousness of guilt. The Defense argued that SM misconstrued Appellant's benign "apology" for an awkward end to their sexual encounter, and that it led to her recharacterizing what she had initially perceived to be a consensual encounter. On cross-examination, she explained that her own personal understanding of the significance of the sexual encounter with Appellant evolved from being a bad one-night stand to a nonconsensual sexual encounter. She admitted that she told the Air Force Office of Special Investigations (OSI) that she initially thought: "I'll just

leave it as a one[-]night stand in my mind, but what changed my mind from it being a one[-]night stand is the fact that Cadet Couty wrote me that [apology] letter." Under cross-examination SM specifically disagreed with trial defense counsel's assertion that she considered it a one-night stand for months. Instead, SM asserted: "No. It was—something about it was different, definitely different. Don't know how to categorize it at the time, because there was kissing. So it was hard for me to—I mainly wanted to forget it happened, but not in the sense of a one[-]night stand."

Notwithstanding her receipt of this apology letter from Appellant, SM continued to wrestle with the right course of action to take in response to the November 2019 sexual encounter with Appellant. Between the incident and the end of her Christmas 2019 break from USAFA, she discussed the incident with her mother and sister, who helped her overcome her initial reluctance to label herself as a victim. Nonetheless, SM was still hesitant to participate fully in a law enforcement investigation, not wanting to psychologically reckon with being a victim. Finally, in January 2021 she formally filed an unrestricted sexual assault report to the OSI—prior to and independent from any other alleged victim's allegations of sexual assault in this case.

### B. Sexual Assault of AR

By March 2021, Appellant and AR had been fellow USAFA cadets for two-and-a-half years, but they rarely spent time together and then only in group settings. While they never dated, they engaged in consensual sex on one prior occasion, approximately in January 2021 when Appellant invited AR to have a "threesome" with Appellant and his then-girlfriend. AR accepted and the threesome occurred in mid-January 2021. Appellant and AR had episodic, incidental contact after the January 2021 encounter, but there was no further talk of sex between the two of them until the evening of 6 March 2021.

On the night of 6 March 2021, Appellant initiated contact with AR via a Snapchat message, seeking to receive or purchase nude photos of AR. He then sent a separate message asking her to meet him. While Appellant did not specifically say the purpose of meeting up was to have sex, that was AR's interpretation of Appellant's intent. AR began showing Appellant's Snapchat messages from this interaction to her roommate because she was concerned that, despite Appellant's assurances to the contrary, Appellant's then-girlfriend (II) would not be okay with Appellant meeting up with AR individually even though the three of them had previously shared a sexual encounter. As a contingency, AR wanted "proof" that it was Appellant who was requesting nude photos and initiating the meeting. Ultimately, Appellant and AR agreed to meet in the hallway outside of her room. From there, Appellant immediately began guiding AR to the sixth floor of their USAFA dormitory, where it was often unoccupied.

Once in an empty dorm room on the sixth floor, AR and Appellant began consensually kissing, touching, and removing their clothes, culminating in AR lying on a bed while Appellant stood and digitally penetrated AR's vulva with her consent. However, Appellant's manner of digitally penetrating was so aggressive that it became painful for AR. AR testified that she told Appellant "no" three times during the digital penetration, in which he stopped only after the third "no." After the third time AR said "no," and while Appellant had his fingers still inside AR, Appellant said, "Wait, are you saying no?" AR responded, "Yeah." Appellant stopped penetrating her and said, "Oh okay." The Government did not charge Appellant with a sex crime for the painful (and eventually nonconsensual) digital penetration—rather, they charged him with what followed after AR ended their encounter.

AR told Appellant to go wash his hands because she believed she was bleeding. While Appellant washed his hands, AR began putting on her clothes. As she testified at trial, in her mind the sexual encounter was over at that point. By the time AR pulled up her underwear and pants, Appellant was again standing in front of her. At that point, approximately two minutes had elapsed since AR indicated that she was no longer interested in sex. Without a word, Appellant initiated a kiss with AR. She turned her head to the side without kissing him back and without saying anything. In response, Appellant commenced to kiss AR's neck for approximately 30–40 seconds. At trial, AR asserted she did not consent to this kissing and was not reciprocating with any physical touching of Appellant during the kissing. On redirect examination, she explained that shock kept her from resisting Appellant's unwanted kissing: "I was mainly confused because I had already said no. And—and no one had ever kept going after I said no, I didn't want. Everyone I'd been with before had been like, all right cool, we're done. And he kissed me and I—I didn't get it."

At the end of the 30–40 seconds of Appellant kissing AR's neck, Appellant turned AR around, positioning her with her back towards him. Then, he pushed her forward, bending her over the bed. Appellant removed AR's pants and inserted his penis into her vagina without her consent. AR estimated Appellant penetrated her for perhaps up to five minutes. AR did not do anything to encourage Appellant to turn her around and begin penetrating her. Explaining why she did not offer more physical resistance to Appellant vaginally penetrating her, AR testified that her hands felt "frozen" in place—her arms bent at the elbows and hands hovering around her waist where the waistband of her pants had been. AR also explained she continued to be shocked at Appellant's actions:

> I did all the right things. I said no. I did what I was taught and
> I said no. So why—why did he keep going? That's not supposed
> to happen, right? But it's not—it's not assault or anything, right,

8

that's not how that works. That's not how it happens in the movies usually so. I did what I was supposed to do, I said no. So I didn't—I didn't know what to do.

AR could not move while Appellant had her pinned and penetrating her. She voiced verbal resistance, saying "no" three times again while Appellant continued to penetrate her vulva with his penis. As before with the digital penetration, Appellant only stopped after the third "no" and said "okay." When he stopped, AR put her clothes on and tried to get Appellant to leave her in the room, but he waited for her to use the bathroom and walked her downstairs to the hallway where her dorm room was located. Appellant attempted to make small talk with her and AR feigned participation. During trial, AR explained, "I needed to figure out what even happened and I wanted to get away from him. And I didn't want him to follow me. And I didn't want him to ask me about it."

Following this incident, AR reported to two friends that she had been sexually assaulted. AR returned to her dorm room with tears in her eyes and told her roommate within minutes of her arrival that she believed Appellant sexually assaulted her. As she recounted the events to her roommate, AR continued to cry, and her roommate hugged her to comfort her. Within a few days, AR confided in another female friend at the USAFA. That friend vectored her towards her Air Officer Commanding (AOC) for advice on options for her as a sexual assault victim. When the AOC asked AR to name her assailant, she named Appellant. At trial, both friends to whom AR reported her alleged sexual assault testified that AR had a "very truthful" character.

Separately, the day after her alleged sexual assault by Appellant, AR contacted Appellant's then-girlfriend, II, to tell her that Appellant had been "cheating on her." She shared screenshots of Appellant's Snapchat messages where he solicited AR for nude pictures. She did not characterize her encounter as a sexual assault because "[AR] didn't want [II] to think her boyfriend was a rapist." Armed with this information, II confronted Appellant about the 6 March 2021 sexual encounter with AR. As II testified at trial, during that conversation, Appellant dissembled and offered false exculpatory statements, initially denying the encounter entirely. When pressed, he admitted he saw AR but denied having sex. When further confronted by II with copies of his Snapchat messages wherein he was essentially soliciting AR for a sexual meet up, Appellant became emotional to the point of nausea.

Meanwhile AR took steps to preserve evidence of her assault. On the fifth day following the sexual assault by Appellant, AR decided to submit to a sexual assault forensic exam (SAFE) after she was informed by the sexual assault prevention and response office at USAFA that time was running out to get the test conducted due to forensic protocols. Accompanied by the second friend to

whom she had reported her sexual assault, AR underwent examination by a sexual assault nurse examiner (SANE) approximately five days after the incident. The exam revelaed a hymenal bruise which was consistent with blunt force trauma from penile or digital penetration. She also provided her underwear to the nurse examiner during the SAFE, for DNA testing. That testing revealed that the DNA mixture was consistent with Appellant's DNA, including trace evidence of semen, and AR's DNA. Those results were admitted into evidence at trial.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

 "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). Ultimately, this court's legal sufficiency analysis "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

For trials involving any convicted offenses committed before January 2021, "[t]he test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (construing the pre-January 2021 version of Article 66, UCMJ). "In conducting this unique appellate role,

we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### a. Sexual Assault of SM

In order to convict Appellant of sexual assault of SM, the Government was required to prove that Appellant: (1) committed a sexual act upon SM, to wit: penetrating her vulva with his penis; and (2) that he did so without SM's consent. Article 120(b)(2)(A), UCMJ; *see also Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). The term "sexual act" is defined as "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, pt. IV, ¶ 60.a.(g)(1)(A). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *Id.* Furthermore, "[a] current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent." *Id.* "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

### b. Sexual Assault of AR

In order to convict Appellant of sexual assault of AR, the Government was required to prove that Appellant: (1) committed a sexual act upon AR, to wit: penetrating her vulva with his penis; and (2) that he did so without AR's consent. Article 120(b)(2)(A), UCMJ; *see also MCM*, pt. IV, ¶ 60.b.(2)(d). The terms "sexual act" and "consent" have the same meaning as recited *supra*.

### c. Mistake of Fact

Mistake of fact as to consent is an affirmative defense to "without consent" sexual assault cases charged under Article 120(b)(2)(A), UCMJ. *See* R.C.M. 916(j)(1). However, for mistake of fact to be a successful defense to this general intent crime, any mistake of fact as to consent harbored by Appellant must have been both honest (subjectively held by Appellant) and reasonable (objectively reasonable in the eyes of a reasonable, sober person under the circumstances). *Id.*; *see also United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) ("For the defense of mistake of fact to exist, 'the ignorance or mistake of fact must have existed in the mind of the accused and must have been reasonable under all the circumstances.'"). If a mistake is honest yet "patently unreasonable," the defense is unavailable to an accused. *United States v. Davis*, 76

M.J. 224, 230 (C.A.A.F. 2017). Nonetheless, once raised at trial, the Government has the burden to disprove the affirmative defense of mistake of fact as to consent, beyond a reasonable doubt. R.C.M. 916(b)(1); *McDonald*, 78 M.J. at 379.

In *McDonald*, our superior court explored the nature of consent and its relationship to proof necessary to disprove mistake of fact as to consent:

> As a general intent offense, sexual assault by bodily harm has an implied mens rea that an accused intentionally committed the sexual act. No mens rea is required with regard to consent, however.
>
> This does not criminalize otherwise innocent conduct because only *consensual* sexual intercourse is innocent. The burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent. [An a]ppellant's actions could only be considered innocent if he had formed a reasonable belief that he had obtained consent. The Government only needed to prove that he had not done so to eliminate the mistake of fact defense. . . .

*McDonald,* 78 M.J. at 381 (citation omitted).

The temporal proximity of prior consensual sexual encounters with a particular victim is relevant to determining whether an accused entertained a reasonable mistake of fact as to consent. *See generally United States v. St. Jean*, 83 M.J. 109 (C.A.A. F. 2022). However, while temporal proximity is a relevant consideration, the mere fact that there was some temporally proximate intimate acts or prior consensual encounters does not axiomatically create a reasonable mistake that a future encounter would also be consensual. *See id.* at 114–15 (holding that the miliary judge did not abuse his discretion in excluding as Mil. R. Evid. 412 evidence the accused's prior consensual kissing with the victim on the evening before the charged misconduct). As the court noted in *St. Jean*, "the fact that a person consented to kissing on one day is not particularly probative of the issue of whether that person consented to full sexual intercourse a day later." *Id.* at 114.

### d. Circumstantial Evidence

The Government may meet its evidentiary burden through either direct or circumstantial evidence. *United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954) (observing that circumstantial evidence is intrinsically no different from testimonial evidence)); *King*, 78 M.J. at 221 (holding that Government is free to meet its burden of proof with circumstantial evidence, and observing that "the ability to rely on circumstantial evidence is especially important in cases, such as here, where the offense is normally committed in private"). Relatedly, consciousness

of guilt type evidence "is an acceptable form of circumstantial evidence used to show 'awareness of an accused that he or she has engaged in blameworthy conduct.'" *United States v. Quezada*, 82 M.J. 54, 59 (C.A.A.F. 2022) (quoting BLACK'S LAW DICTIONARY 379 (11th ed. 2019)).

### 2. Analysis

#### a. Sexual Assault of SM

Appellant contends his conviction for sexually assaulting SM is legally and factually insufficient because he had a reasonable mistake of fact that she consented. As we understand Appellant's argument, he is essentially relying upon: (1) SM allowing Appellant to stay in her room and sleep in her bed after Appellant tracked down which room she was sleeping in and arrived at her door uninvited claiming to be too drunk to drive back to USAFA; (2) the "make out" session, which SM conceded was consensual, that preceded the sexual intercourse and ended minutes prior to the sexual intercourse; (3) SM not verbally or physically resisting Appellant while he penetrated her vulva as she lay flat, face down and facing away from him on the bed with his right arm pressing down on her upper back holding her in place; (4) SM asking Appellant to "change positions" during the encounter as indicative that she had voluntarily participated in the sex up the that point; and (5) her statement that prior to reading Appellant's apology letter to her she considered the 26 November 2019 encounter to be a "one[-]night stand." We are unpersuaded by all these arguments.

Before proceeding to analyze Appellant's argument that he harbored a reasonable mistake of fact—an affirmative defense—we pause here to affirm that the Government's proof at trial satisfied both elements of this sexual assault offense. First, Appellant's apology-letter admissions, when read in context and combined with SM's testimony at trial, conclusively establish that a sexual act took place (to wit: penile penetration of SM's vulva by Appellant). Second, SM's testimony demonstrates that she did not consent to that act because she withdrew her consent to the "make out" session—which had involved only kissing and fondling, not sex—by telling him "I'm too drunk for this." SM then reenforced that express verbal withdrawal of consent by rolling off and away from Appellant and attempting to sleep without any additional physical contact or conversation with Appellant. While SM initially offered no physical resistance to Appellant during the sexual act, as a matter of law, she was not required to because: "[l]ack of verbal or physical resistance *does not* constitute consent." Article 120(g)(7)(A), UCMJ, 10 U.S.C. § 920(g)(7)(A) (emphasis added). Likewise, we are unconvinced by Appellant's argument that SM's request to "change positions" as Appellant was penetrating her vulva was indicative of her consent to the penetration up to that point. Instead, we are convinced by SM's explanation during her testimony that she used this phrasing as a

nonconfrontational way to get Appellant to stop. This interpretation is supported by evidence that SM immediately repositioned her body in a way that avoided physical contact with Appellant by crossing her legs and leaving her hands protectively at her side, such that Appellant could not reinitiate sex with her.

While Appellant provided some evidence that he may have had an honest mistake of fact as to consent, a review of the evidence presented in this case convinces us that even if we were to assume Appellant had any honest mistake of fact as to consent, such a belief would have been unreasonable under the circumstances. *See Rodela*, 82 M.J. at 529 ("Just as a victim's 'lack of verbal or physical resistance does not constitute consent,' *MCM*, pt. IV, ¶ 60.a.(g)(7)(A), a victim's lack of verbal or physical resistance, without more, is not some evidence of a reasonable belief that consent has been obtained (or given)."). Here, SM rebuffed Appellant by explicitly telling him "I'm too drunk for this," disengaging from kissing him, and then rolled off him, turned away, and lay silently for several minutes. It was Appellant who then unilaterally re-initiated physical contact with SM by mounting her from behind while she lay flat and pulled her underwear to the side so that he could penetrate her vulva with his penis. Appellant's unilateral reinitiation was not a product of SM's cooperation or encouragement, either verbally or physically. Appellant's decision to reengage with her might have been prompted by wishful thinking that perhaps he could rekindle the "make out session" the two had just engaged in, but it was unreasonable. Here, the circumstances of his reinitiation—done silently, in a dark room, without a word from Appellant to SM, much less a contemporaneous request or approval for sexual intimacy that she had just verbally disclaimed and physically disengaged from several minutes before—are not reasonable grounds to believe she was consenting at the time he penetrated her vulva for the first time. SM stating "I'm too drunk for this" would have been viewed by any reasonable person, and should have been viewed by Appellant, as her "no" to any further intimacy with him that night.[6] We decline Appellant's invitation

---

[6] In light of our superior court's recent opinion in *United States v. Mendoza*, we considered whether the Government's proof, which included SM referencing her level of intoxication, involved the Government convicting Appellant on "a different theory of criminal liability and a different offense than the one the Government charged." __ M.J. __, No. 23-0210, 2024 CAAF LEXIS 590, at *20 (C.A.A.F. 7 Oct. 2024).

Neither party suggested in their briefs that evidence of SM's intoxication level was irrelevant or inadmissible in this Article 120(b)(2)(A), UCMJ, "without consent"-theory case, nor do we find it so. Instead, we read our superior court's decision in *Mendoza* as precluding not evidence but *theories* based upon the charging construct. *Id.* at *18 ("[W]hat the Government cannot do is charge one offense under one factual theory and

to conclude that her mere act of remaining in the same bed as Appellant after she declined to participate in any further physical intimacy with him was an open invitation to his initiating this sexual act. Lying motionless, facing away from Appellant—a man with whom she had no prior sexual or romantic relationship—is not the sort of indicia that an objective person under the circumstances would view as an invitation to have sex. Any mistake of fact on the part of Appellant as to consent, given these circumstances, was blatantly unreasonable.

Additionally, we see no intervening event which would have made a reasonable person think SM changed her mind after her initial refusal, as she did nothing verbally or physically to indicate she wanted to have sex with Appellant. While Appellant points to SM's request to "change [sexual] positions" as an indicator that she was consenting or that he reasonably thought she was, her actions and his actions following this request indicate otherwise. Furthermore, once Appellant moved off her, she crossed her legs to prevent Appellant from engaging in any further intimate contact. Apparently, Appellant judged from SM's response that he had crossed the line, because later he wrote her an apology note. Thus, based on the circumstances described here, we are firmly convinced that any mistake of fact on the part of Appellant was unreasonable.

Furthermore, given the context of the evening, other facts Appellant relies on to show a reasonable mistake of fact are not persuasive. Appellant asserts that by letting him in the room where she was sleeping, SM created grounds for him to reasonably infer that she was open to any and all of his sexual advances. However, simply being alone in the room together is not by itself indicative of sexual interest. Appellant was not invited to SM's room; instead, after texting her asking what room she was staying in and receiving no answer, he searched for SM. Once he appeared uninvited at her door, he asked to come in under the excuse that he had been drinking and should not drive back to the

---

then argue a different offense and a different factual theory at trial."). Consistent with the express statutory language from Article 120(g)(7), UCMJ, 10 U.S.C. § 920(g)(7), in effect at the time of Appellant's trial, "all the surrounding circumstances" are pertinent to ascertaining whether sexual relations between the parties were consensual. As such, evidence of alcohol consumption remains relevant in "without consent" prosecutions. What *Mendoza* teaches us is that in "without consent" prosecutions under Article 120(b)(2)(A), UCMJ, the Government must ultimately provide proof that the victim was capable of consenting but did not consent. *See id.* at *17. Proof of alcohol consumption and its effects on a particular victim could certainly be relevant to that determination, as is the case here, by presenting the trier of fact with evidence that an otherwise competent victim was less likely to consent to sex because they were feeling nauseous or tired. *See id.* at *22 (footnote omitted) ("Nothing in [Article 120, UCMJ,] bars the Government from offering evidence of an alleged victim's intoxication to prove the absence of consent.").

USAFA (even though he had consumed less alcohol than SM that evening). She permitted him to stay after suggesting he could and should get one of the air mattresses available elsewhere in the house. The fact that SM relented and let a fellow USAFA cadet, who claimed he was too intoxicated to drive, into her room is more indicative of the camaraderie expected of cadets in the tight-knit USAFA community than of romantic interest. In fact, Appellant and SM had no prior romantic relationship and no prior sexual relationship. Appellant's attempt to manufacture a sexual interlude does not mean SM consented to one. In short, Appellant's desires and wishful thinking do not constitute a reasonable mistake of fact as to consent.

Neither are we persuaded by Appellant's argument that he was entitled to rely upon SM's initial lack of physical and verbal resistance during the approximately one minute of vaginal penetration as indicia of consent on her part or a reasonable mistake of fact on his. Appellant effectively asserts that a reasonable person in Appellant's circumstances could mistakenly construe SM not physically resisting his ongoing penetration of her vulva as evidence that she consented when the statutory definition of consent provides otherwise: "Lack of verbal or physical resistance or submission resulting from the use of force . . . does not constitute consent." Article 120(g)(7)(A), UCMJ. Here, Appellant surprised and overpowered SM—he penetrated her vulva from behind as she lay face down and facing away from him while he, a USAFA boxer and therefore presumably strong, braced himself by planting one of his hands on her back to pin her in place. As a matter of law, her shocked silence is not consent, and no reasonable person under the circumstances would think otherwise.

We are also not persuaded by SM's concession that she initially perceived her encounter with Appellant as a "one-night stand" as an indication that she actually consented to him penetrating her vulva with his penis after she had previously told him, "I'm too drunk for this," and ended their "make out" session. Her perception of the incident and of the significance of Appellant initiating penetration of her vulva without her invitation or consent evolving over the course of the weekend does not create any impediment to our finding it both legally and factually sufficient now. During Appellant's trial, SM explained her changing thoughts and feelings. Given that SM was a young college student at the time of the incident, not a healthcare or law enforcement professional, we find her explanation credible.

Finally, Appellant's own consciousness of guilt manifested in his apology letter to SM: (1) supports that the underlying sexual act occurred; and (2) undercuts his assertions that he was laboring under a reasonable mistake of fact.

Ultimately, we are firmly convinced that SM did not consent to Appellant penetrating her vulva with his penis and that any mistake of fact as to consent on the part of Appellant was unreasonable. Prior amorous exchanges on the

night in question did not vitiate SM's personal autonomy—she was entitled to change her mind as to whether she desired sexual intimacy with Appellant or not. "I am too drunk for this" are not the words of consent, and no reasonable person under the circumstances of this case would think they were.

### b. Sexual Assault of AR

The crux of Appellant's argument is that (1) no rational trier of fact could have found Appellant guilty of sexually assaulting AR because he and AR engaged in a consensual threesome approximately six weeks prior to the charged misconduct; and (2) consensual kissing and initially consensual digital penetration in the moments prior to the charged misconduct demonstrate that AR either actually consented to Appellant vaginally penetrating her, or that he had a reasonable mistake of fact that she consented. We are unconvinced by Appellant's arguments.

First, Appellant argues AR's testimony at trial that she did not consent was based on a "fundamental misunderstanding of the law of consent"—essentially arguing that AR premised her understanding of lack of consent primarily on the physical pain she experienced when Appellant vaginally penetrated her.[7] However, our review of the record leads us to conclude that this argument is unsound as both a matter of fact and law. Factually, AR testified that following the uncomfortable and painful digital penetration by Appellant, she did not want to engage in vaginal sex with him. She told him "no" three times to get him to stop his digital penetration of her and then further demonstrated her lack of interest in resuming the sexual encounter by telling Appellant to go wash his hands. Furthermore, she took the opportunity while Appellant was washing his hands to begin redressing, pulling up her underwear and pants. The pain she felt during Appellant's uninvited and unwelcome vaginal penetration of her on 6 March 2021 was not the reason for her allegations—it was an impetus for her to decide she could not endure this nonconsensual sex anymore and to tell Appellant "no" three additional times to get him to stop. Appellant's argument that physical discomfort cannot form a basis for nonconsensual sex acts is just wrong. A person can decide for any reason not to disengage from a prior "freely given agreement" to sex. Indeed, physical discomfort is likely a common reason for disengaging from sexual intercourse as it would be for any other activity. Nothing within Article 120(g)(7), UCMJ, forecloses

---

[7] Appellant defense counsel assert in their brief: "AR did testify that the sex was nonconsensual in her mind. However, just like SM, this was based on AR's fundamental misunderstanding of the law of consent. AR testified that 'because it hurt . . . I was raped.' This of course is not how consent works."

personal reasons for withdrawing from a freely given agreement to engage in sexual acts.

Second, Appellant argues that an "ongoing sexual relationship" between him and AR—beginning with a threesome six weeks prior to the charged misconduct, flirtatious Snapchat messaging the evening of the charged misconduct, and initially consensual digital penetration just prior to the charged misconduct—creates a reasonable mistake of fact that AR consented to Appellant vaginally penetrating her with his penis. Not so. First, as recited *supra*, and as recognized by our superior court in *St. Jean*, prior consensual acts do not axiomatically create consent or a mistake of fact as to consent for future acts. 83 M.J. at 114. They might, but each case must be evaluated based on the totality of its unique circumstances.

Here Appellant endeavors to overcome the plain indicia of a lack of consent, *i.e.*, AR ending the digital penetration with a chorus of "noes," telling Appellant it was physically uncomfortable, and starting to get dressed again. He attempts to do so by asserting that her failure to flee from him somehow gave Appellant the impression she was open to further sexual acts with him. We disagree. Having just been told "no" and that their digital penetration of their partner's vagina was physically uncomfortable, a reasonable person would not assume that the partner would consent to vaginal sex with penile penetration moments later. A reasonable person would not assume that by getting dressed their partner is expressing a nonverbal cue that they consent to reengage in sexual activities. While it is true that, other than turning her head when Appellant kissed her on the mouth, AR did not physically resist Appellant's reinitiation and did not verbally resist until a few minutes into Appellant vaginally penetrating AR with his penis, as a matter of law, she was not required to. *See* Article 120(g)(7), UCMJ ("Lack of verbal or physical resistance or submission resulting from the use of force . . . does not constitute consent."). Contrary to Appellant's contentions on appeal, AR did not testify that she helped Appellant remove her clothes. In fact, during direct examination she outright denied that she did so. In initiating the sex act, Appellant placed AR in a submissive position, bending her face down forward over the bed while his body weight held her in place as he penetrated her. Under the circumstances, not physically resisting an act AR never agreed to, and voicing verbal resistance later only when the pain grew too much to continue to endure, are not indicia of consent or of reasonable mistake of fact as to consent.

Considering the totality of the circumstances and drawing all reasonable inferences in favor of the Government, we are firmly convinced that Appellant's conviction is legally sufficient. Furthermore, taking a fresh look at the evidence, we are firmly convinced that Appellant's conviction is factually sufficient. Appellant's contentions notwithstanding—"no" does not mean "yes." AR

did not consent, and the mistake of fact defense does not apply where, under the circumstances, no reasonable person would perceive that she did.

## B. Appellant's Right to Counsel of Choice

### 1. Additional Background

Appellant was first made aware of his rights to appellate defense counsel on 14 January 2023, prior to entering his pleas at his court-martial. His trial defense counsel provided him with an 11-page post-trial and appellate rights advisement document and explained its contents to Appellant. Appellant then signed the final page of that document, averring that his trial defense counsel had fully apprised him of all the matters contained therein, and that Appellant had read and understood the document. At trial, the military judge held a brief colloquy with Appellant, on the record, in which Appellant once again averred the same. That post-trial and appellate rights advisement document specifically advised Appellant that he had the right to appellate defense counsel to represent him on appeal to this court and to our superior court.

On 24 January 2023, following announcement of sentence in his case, Appellant was again advised of his rights to appellate counsel, this time via Air Force Form (AF Form) 304, *Request for Appellate Defense Counsel* (Nov. 2019). Appellant signed this AF Form, which contained the following language:

> I am entitled to request that appellate defense counsel represent me before the Air Force Court of Criminal Appeals or the Court of Appeals of the Armed Forces . . . . I also understand that I am entitled to retain civilian defense counsel at no expense to the [G]overnment to represent me before the court.

Appellant's case was docketed with this court on 20 June 2023. In the course of his appeal, Appellant's military appellate counsel requested and received, over written opposition from the Government,[8] 11 enlargements of time (EOT) to file his assignment of errors brief. The record before us also reflects that Appellant was aware of the status of his case with his military appellate defense counsel, of the recurrent delays requested on his behalf, and the timelines therefor.

Beginning with the motion for his fifth EOT request (EOT 5), Appellant's military appellate defense counsel averred in each subsequent request that "Appellant was advised of his right to a timely appeal. Appellant was advised of the request for this enlargement of time. Appellant has provided limited

---

[8] The Government opposed each EOT request from Appellant's military appellate defense counsel.

19

consent to disclose a confidential communication with counsel wherein he consented to the request for this enlargement of time."

After Appellant's motion for his eighth EOT request (EOT 8), this court advised Appellant via its order that "given the number of enlargements granted thus far, the court will continue to closely examine any further requests for an enlargement of time." Thereafter, in its 7 May 2024 order granting Appellant's motion for his ninth EOT request (EOT 9), this court advised Appellant that he "should not rely on subsequent requests for enlargement of time being granted" and that "any requests for future enlargements of time may necessitate a status conference prior to the court taking action on any forthcoming request."

Thereafter, on 11 July 2024, in response to Appellant's eleventh EOT request (EOT 11), this court held a status conference with the parties to consider whether there were any "exceptional circumstances" to justify granting Appellant's request, which, if granted, would have marked 420 days of delay from the time Appellant's case was docketed with the court until the deadline for filing his brief. Despite Appellant's military appellate defense counsel's candid concession during the status conference that no "exceptional circumstances" existed, in our order dated 12 July 2024 we nonetheless granted Appellant's request, albeit with the additional supervisory conditions, agreed to by Appellant's military appellate defense counsel, that Appellant must submit a non-binding list of anticipated assignments of error with the court not later than 15 days after the date of the court's order.

On 12 August 2024, Appellant, through his appellate military defense counsel, filed a motion requesting a twelfth EOT (EOT 12). This request was filed out of time (OOT)—a mere 24 hours prior to the due date for his assignment of errors brief. In that request, for the first time, Appellant stated that he wanted a civilian counsel and was in the process of hiring civilian appellate defense counsel to represent him. Specifically, Appellant requested an additional 30 days to finalize the hiring of civilian appellate defense counsel, to wit: Ms. AH and Ms. SK, and thereafter to submit a supplemental assignments of error brief. Rule 18.5 of this court's Rules of Practice and Procedure requires that "[a]ny filing that is submitted out of time . . . shall articulate good cause for why the filing is out-of-time." A.F. CT. CRIM. APP. R. 18.5. In his EOT 12 (OOT) request, Appellant specifically expressed that he has shown good cause because he "has an absolute right to representation by counsel on appeal," and "[t]hat right extends to the hiring of civilian appellate counsel at [his] own expense."

According to the record presented in the filings of the parties to this court, Appellant has made no allegations that his appellate military counsel was or is ineffective; nor has he ever requested that his military appellate defense

counsel withdraw from the representation; nor has he ever indicated that he intended to release his military appellate defense counsel.

Meanwhile, on 13 August 2024, Appellant's detailed military defense counsel, acting in accordance with the filing deadline ordered by the court for Appellant's EOT 11 request, filed an assignments of error brief on behalf of Appellant, enumerating three assignments of error, including one personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

On 14 August 2024, this court summarily denied Appellant's untimely EOT 12 (OOT) request.

On 10 September 2024, counsel for Appellant submitted a motion for reconsideration concerning this court's prior denial of Appellant's motion for his EOT 12 (OOT) request. The Government opposed the motion.

Meanwhile, processing of Appellant's case continued with the Government filing its answer brief to Appellant's assignment of errors on 12 September 2024, and Appellant filing his reply brief on 19 September 2024.

On 24 September 2024 this court issued a six-page order denying Appellant's motion for reconsideration of this court's prior denial of Appellant's EOT 12 (OOT) request.

Thereafter, on 22 November 2024, Appellant filed a Motion for Leave to File Supplemental Brief on Behalf of Appellant and Supplemental Brief on Behalf of Appellant, seeking to file a supplemental assignment of error related to this court's denial of Appellant's EOT 12 (OOT) request. Over the Government's opposition, the court granted Appellant's motion on 6 December 2024.

To date, Appellant has presented no evidence to this court that he ever hired any civilian appellate defense counsel to represent him in this case. Moreover, this court has received no notice of representation of Appellant from any civilian appellate defense counsel.

**2. Law**

Both the Sixth Amendment of the Constitution[9] and Article 70, UCMJ, 10 U.S.C. § 870, provide appellants with the right to effective assistance of counsel upon appeal. *See United States v. Brooks*, 66 M.J. 221, 223 (C.A.A.F. 2008) (citing *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985)). Article 70(c), UCMJ, 10 U.S.C. § 870(c), provides for the right to a detailed appellate military counsel, and Article 70(d), UCMJ, 10 U.S.C. § 870(d), provides for the right for an

---

[9] U.S. CONST. amend. VI.

appellant to hire, at his own expense, a civilian defense counsel to represent him. "[T]he core purpose of the counsel guarantee was to assure '[a]ssistance' at trial . . . ," and on appeal, *United States v. Ash*, 413 U.S. 300, 309, n.7 (1973), and thereby "to assure fairness in the adversary criminal process," *United States v. Morrison*, 449 U.S. 361, 364 (1981) (citations omitted). Nonetheless, while an appellant enjoys a right to choice of counsel, this right is not absolute as it was not "the essential aim of the Amendment . . . to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988) (citations omitted).

An erroneous deprivation of an appellant's choice of counsel is structural error and thus not subject to harmless-error review. *See McCoy v. Louisiana*, 584 U.S. 414, 427 (2018) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (additional citations omitted).

Nonetheless, an appellant does *not* have a constitutional right to indefinite delays of his case on appeal, whether invoked for purposes of obtaining counsel of choice or otherwise, and our superior court has recognized the inherent authority of the Courts of Criminal Appeals (CCAs) to employ reasonable means to control their dockets and ensure the timely processing of appeals. *See United States v. Roach*, 66 M.J. 410, 418 (C.A.A.F. 2008) (citations omitted) (holding "the [CCAs] have broad power to issue orders to counsel to ensure the timely progress of cases reviewed under Article 66[, UCMJ, 10 U.S.C. § 866]"); *Moreno*, 63 M.J. at 143 (noting CCAs are expected to "document reasons for delay and to exercise the institutional vigilance that was absent in Moreno's case" as part of ensuring timely appellate review); *United States v. May*, 47 M.J. 478, 482 (C.A.A.F. 1998) (holding that CCAs are empowered to ensure military appellate counsel abide by their "obligation to comply with court orders and protect the interests of their client").

These supervisory powers of the CCAs remain robust even in cases where an appellant opts to exercise his choice of counsel. The Supreme Court of the United States has reiterated: "[w]e have recognized a . . . court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citing *Wheat*, 486 U.S. at 163–64; *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)); *accord United States v. Watkins*, 80 M.J. 253, 258 (C.A.A.F. 2020)). Of course, in balancing those interests, we are also aware that "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997) (citation omitted) (analyzing denial of a continuance which resulted in nonavailability of appellant's choice of civilian trial defense counsel).

### 3. Analysis

In denying Appellant's EOT 12 (OOT) request, this court was not engaging in arbitrary insistence of expeditiousness to the exclusion of all other factors. Rather, we have broad discretion and a wide range of acceptable choices in deciding whether a particular EOT request is supported by good cause. Here, that decision came in the context of a progressive course of this court balancing its own legitimate docket management concerns with Appellant's interests in securing additional time to research and draft what he viewed as an efficacious brief on his behalf.

Even assuming arguendo that this court's denial of Appellant's EOT 12 (OOT) request adversely impacted a nascent attorney-client relationship, such "deprivation" of Appellant's *opportunity* to form a late-breaking attorney-client relationship (vice actual severance of an existing attorney-client relationship) with a civilian defense counsel some 419 days after docketing in his case was not erroneous. Choice of counsel is an important right, and this court will accommodate it within reasonable circumstances—but it is *not* absolute. Here, the court's prior order was a reasonable application of the factors governing Appellant's choice of counsel on appeal for three primary reasons: (1) as of at least 120 days prior to his EOT 12 (OOT) request, Appellant was on notice regarding this court's position on the reasonableness of continued protracted delays in his case; (2) Appellant's Article 70, UCMJ, rights were already fulfilled by his presumptively competent military appellate defense counsel who filed an assignment of errors brief on Appellant's behalf on 13 August 2024; and (3) Appellant made no allegations of defective representation against his military appellate defense counsel, which might have necessitated withdrawal or dismissal of that counsel and would have served as a justification to prioritize Appellant's exercise of his choice of counsel over all other competing interests even at this late stage of his appellate process; and finally, (4) to date, Appellant has conceded in his filings with this court that he never retained civilian counsel in this appeal.

To be clear, this court's denial of Appellant's untimely EOT 12 request in no way violated Appellant's choice of counsel and in no way impacted the exercise of his appellate rights. Our order did not prevent Appellant from filing a brief through counsel, nor from having substantive input on its contents,[10] nor did it sever an existing attorney-client relationship between Appellant and Ms. AH and Ms. SK because no such relationship existed. The fact that Appellant chose as a practical matter not to retain Ms. AH and Ms. SK after this court denied his EOT 12 (OOT) request was his own tactical calculation, not

---

[10] Indeed, we note that the brief filed by Appellant's military appellate defense counsel included a *Grostefon* issue specifically raised by Appellant himself.

an outcome mandated or required by any decision of this court. Furthermore, no action of this court prevented Appellant from retaining Ms. AH and Ms. SK prior to filing his request for an EOT 12, albeit OOT.

In effect, Appellant would have us find a violation of his choice of counsel rights whenever any temporal restraints are placed upon his exercise of those rights. We are not persuaded. No precedent from the Supreme Court nor our superior court supports that position, perhaps because that position is inherently untenable. Such an open-ended interpretation would effectively yield docket management to appellants, rendering this court, and all reviewing appellate courts, as mere ciphers to their indeterminate desires.

Appellant also attempts to analogize this court proceeding with its appellate review without a brief from a civilian counsel, whom he never retained, to our superior court's decision in *Roach*. However, the facts of these cases are not analogous. In *Roach* our superior court found error and reversed where this court proceeded without any brief from Appellant after Appellant's repeated failure to file a brief within the timelines set by the court. 66 M.J. at 419. In contrast, here Appellant's qualified military appellate defense counsel filed a brief after requesting and securing 11 enlargements of time in which to do so.

In the end, the right to choice of counsel, while fundamental, is not limitless and must be exercised responsibly. Notwithstanding Appellant's apparent insistence that all interests must yield to his unilateral decision to employ civilian defense counsel at a time of his choosing, the public interest in finality of appeals, concomitant with this court's docket management, is a component we must weigh to safeguard the interest of all parties in the timely processing of appeals. Under the unique circumstances of this case, this court is *not* required to yield all other interests in the timely processing of appeals to Appellant's untimely election. This decision is more than a mere exercise of authority for authority's sake—we are invested with responsibility to process military criminal appeals in a timely and reasonable fashion. *See Moreno*, 63 M.J. at 137 ("Ultimately[,] the timely management and disposition of cases docketed at the Courts of Criminal Appeals is a responsibility of the Courts of Criminal Appeals."). Appellant had ample opportunity—at least 419 days after docketing with this court—to hire a civilian appellate defense counsel. He did not. Appellant's claim that this court "deprived" him of a choice of civilian counsel whom he never hired is wholly without merit.

## C. Excessive Post-Trial Delay

### 1. Additional Background

Appellant's record of trial was originally docketed with this court on 20 June 2023. Appellant requested and was granted, as outlined in detail *supra*, 11 enlargements of time, amounting to 420 days or 14 months of total delay, to

file his assignments of error brief before filing his brief on 13 August 2024. The Government filed its answer brief on 12 September 2024. Appellant then filed his reply brief on 19 September 2024. Thereafter, on 22 November 2024, Appellant requested leave to file a supplemental AOE, discussed at Part II.B.1, *supra*, and over the Government's opposition, the court, on 6 December 2024, granted Appellant's motion. The Government then filed its answer to the supplemental AOE on 18 December 2024. In sum, even with the additional time allotted by this court to Appellant to facilitate his supplemental AOE, a little under 20 months elapsed between the docketing of Appellant's case and the issuance of this opinion.

### 2. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *Moreno*, 63 M.J. at 132 (citation omitted). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." 63 M.J. at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Id.* at 135 (citations omitted).

The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

### 3. Analysis

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno*, there is a facially unreasonable delay. Although we note the 18-month threshold was exceeded by roughly four months, under similar circumstances where that delay was primarily occasioned by extended periods of defense-requested delay we have held

that such delays are not "excessively long." *See, e.g., United States v. Washington*, No. ACM 39761, 2021 CCA LEXIS 379, at *109 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (holding that 23 months from case docketing to issuance of the court's opinion was "not excessively long" in a five assignment of error case resulting in three separate opinions from the panel).

Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we do not find any. With regard to oppressive incarceration, we recognize Appellant entered confinement on 21 January 2023, and to date Appellant has not entered any request for speedy appellate review nor raised any particularized anxiety or concern as a consequence of the pendency of appellate proceedings before this court. Accordingly, we find no prejudice from any unreasonable delay. Absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. The record of Appellant's court-martial is substantial, including over 800 pages of transcript, and the delay in adjudicating Appellant's appeal is primarily due to Appellant's own motions for enlargements of time. Accordingly, we find no violation of Appellant's due process rights. Furthermore, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court